In this case, Mr. Lopez's conviction should be reversed. His case remanded for new trial because the government impermissibly and unfairly threw questions and answers, and I counted no less than seven questions with six answers, and in closing argument commented on his right to silence and on his right to appeal. The Supreme Court's prescription against the implicit assurance that silence isn't going to be used against you when you invoke that right under Doyle v. Ohio. Counsel, are Doyle errors subject to harmless error analysis? Do you agree that they are? Yes, and indeed, since it was preserved, it's the government's burden in this case to demonstrate harmlessness beyond a reasonable doubt. Let me just give you a sort of colloquial statement of my difficulty with your position and get your reaction to it. It seems to me that the prosecutor's most powerful argument was the permissible one, the pre-arrest silence, that when he presented himself at the border, he said nothing about a man with a knife, nothing about someone chasing him, that a normal person who's being chased by someone with a knife and who's terrified for their life, when they finally get to somebody, would say, oh, thank goodness you're here. Please save me from the guy with the knife, and that that was the most powerful argument, and that the marginal value of much later silence really would have no bearing on the outcome. What's wrong with that? The prosecutor made those arguments and knew how to make them and limit them. The prosecutor specifically asked the questions of each individual agent all about, you know, when you first saw the security officer, you didn't say this. When you first saw these two agents, you didn't say this. That's my point. Why doesn't that obviate any harm that could flow? Because that is such incredibly powerful evidence. Why isn't everything else pale by comparison? Because actually Mr. Lopez explained precisely why he didn't make those statements and said, look, I walked up to them and said, arrest me. I want to be off the streets. I want to be safe. And he indicated that he did indeed make statements that he believed were sufficient to communicate his threats, and he explained those. The statements that weren't explained were in response to the prosecutor's questions where he went on to state things such as, the first time you ever told anyone of the fear was yesterday, and that question was answered, only the answer was stricken. And that's at excerpt of record, page 226. He also said, you told no one on September 17th of these threats. Clearly an impermissible question. The judge sustained his own objection, but nothing, no curative was given with any explanation. Then the prosecutor previously also asked five additional impermissible questions, and they begin at excerpt of record, page 218, when he says, you went to the border patrol station and you met border patrol agents, one of which is Agent Harrington, to whom the invocation was given, and he says, you never told one of them about any threats. And there's an answer there. And then he says, you never told any of the border patrol agents about any threats that occurred to you in Mexico, did you? No, sir. You never told any of the border patrol agents who were there about any guys with knives who were chasing you, did you? No, sir. You didn't tell any of them about anything about being scared, running for your life into the United States, did you? No, sir. Then he specifically says, you remember meeting with Agent Harrington, the agent to whom the invocation is given, and on page 220, excerpt of record, you didn't tell him about, I'm actually scared because I was running from a guy who tried to kill me. You never told him that, did you? And these, even the judge is confused about the context in which these questions are being asked because of their breadth. Agent Harrington is obviously a border patrol agent, and Mr. Lopez is being questioned. You never told any border patrol agent after he's assured under Doyle and the Miranda warnings that his silence with the border patrol agent Harrington isn't going to be used against him. It clearly was. These were very powerful. They were not responded to with any substantive explanation by Mr. Lopez because there isn't one that could possibly be posited. He's supposed to be secure from that sort of engagement. Now, what are you relying upon in the record to support your assertion that the judge was confused? The judge says so at excerpt of record, page 220. It says, the court, Mr. Solel, what's the context in which this opportunity to communicate arose? I am confused here because I am not sure. The Doyle objection goes to the implication, but I am not sure of the context in which you're inquiring of these opportunities to speak. And so then what did the judge do as a result of that statement? The government tells the judge, well, I'm talking about the initial pre-Miranda processing. And the judge says, that was my understanding, but if that's not the case, then I would sustain the objection. So then the government agreed that it would refrain from making any references post-Miranda? The government says, I'm not going to go any further, judge. And the judge says, well, I'm assuming that it's the pre-processing and admonishes the government not to go any further, which then the government did go further in spite of the admonishment. But the problem with that is that just because the judge may believe, because of pretrial hearings, that it's in the pre-processing and that the prosecutor in his own mind thinks that's what he's asking about, this Court's cases are very clear. Velarde Gomez says specifically that, well, the government could have asked a question such as, what was his physical response instead of what was his response, if that's what they meant. In United States v. Baker, this Court held that the judge's assumption that the statement referred to the pre-processing or pre-Miranda wasn't sufficient because the jury doesn't know that. No, we can't use the, and recognizing it's the government's burden to prove that this emphasis on the post-arrest silence was harmless beyond a reasonable doubt, because it is constitutional error. The way this comes up, you can't really use the, or explain to me if I'm wrong about this, there was overwhelming evidence of guilt, and therefore, because he admitted that he had, all the elements of the crime. We're talking about solely the defense of duress. So the government must demonstrate that there was overwhelming evidence that he was not under duress. Given that, what was the prejudice caused by the emphasis on, and from my reading of this, somewhat intentional and deliberate disregard of the judge's order on the motion in limine, what was the prejudice that flowed by crossing the line repeatedly and getting away with it because the judge somehow didn't understand where the line was? Well, the prejudice specifically was the inference of guilt that the prosecution asked the jury to draw. The prosecution did not limit in any way the closing argument remarks, as he didn't limit his questions, to, you know what, if I was really scared, I would have immediately said to the security officer, oh, my gosh, there's people trying to kill me. That's not his argument. And he really couldn't make that argument because Mr. Lopez, in fact, comes into the United States, and then he doesn't go about and mingle with the population. He hangs out at the port of entry, right outside the door, and he keeps coming back, and he asks repeatedly, arrest me. I need to be safe. Get me off the streets. They don't arrest him. No. And they don't arrest him. And he keeps trying. So really. People that don't want to get arrested are. Exactly. You know, it is ironic that Mr. Lopez. That would be consistent with his statement that he wanted to be off the streets, not necessarily for because he was afraid of somebody killing a knife, but or because he didn't have anywhere to stay for a number of reasons. But there's a dispute between Mr. Lopez's statement and the Border Patrol agents who never wrote down in their report anywhere that, in fact, the statement is I need to be off the streets because I don't have anywhere to go, because I couldn't contact my family. That's a dispute. So the prosecutor. And that was given to the jury. I mean, the jury heard all of this. Yes. And the jury made a determination regarding credibility on this issue. But that determination was unfairly infringed upon by these comments on silence because the prosecutor said in closing argument he didn't tell any of the agents, any immigration officer, any customs official, anybody that he had been threatened. And this is directly referring to the period of time of which Mr. Lopez has offered no explanation. I still keep coming back to imagining the absolutely perfectly proper argument of another prosecutor who says I want you to think about the first half hour or whatever it was, the first person he talked to. He didn't say a word about this. He didn't act this way or that way. He wasn't agitated. He was calm and he didn't say anything about it. I mean, a 100% absolutely by-the-book argument, it seems to me, would have had exactly the same effect. And I guess I just have difficulty seeing why this very slightly broader argument would have a different effect on the jury who had an opportunity to look at your client in the eye and decide if he was telling the truth about the circumstances of his border crossing. But there is no – the client presented plausible explanations as to what – he made responses, you know, I want to be arrested, as to why he didn't come forward and spew everything. And there's no response that he could have made because he was told that his silence wouldn't be used against him when questions got to him. No, but his silence can be used against him up to the point of his arrest. But I mean post-Miranda. Okay. That was where the – I guess my difficulty is that his silence for a very long period of time in this case, because it took a long time for him to get arrested. As you've pointed out in your colloquy, a whole lot of stuff happened before he was arrested. So that whole – all of that silence is completely admissible and is completely proper subject for argument and questioning. And I just have difficulty seeing that any jury would have had a different reaction if the prosecutor had started every sentence by saying, in that first hour this, in that first hour that. And wouldn't you think that somebody would act differently? Well, because since he explained what he was thinking and what he was saying – We didn't believe his explanation. But we don't – we really don't know. And that's where the beyond a reasonable doubt harmless error standard comes in. And that's where this Court in – Velarde Gomez could have said, you know, they saw Mr. Velarde Gomez, they assessed his demeanor, and they just didn't believe his story of innocence. That's not what the Court said there or in Guam v. Territory of Valoria, where there was one comment only and the case was reversed, in Newman, where there were three comments but curative instructions, which we don't even have here. And in all of those cases, there was also a suggestion, and especially in Baker, that there could have been a proper argument as to the post-arrest but pre-Miranda silence. And the Court in Baker said that, you know, without an explanation of Miranda and a limiting instruction, there's no reason to believe the jury understood the narrow grounds on which counsel statements may have been permissible. And that's the suggestion, then, that in this particular case, the prosecutor really focused, I think primarily, on the statements that you never told anybody, nobody, at no time, thus this must be false. And there was no explanation offered for the jury to fall back on, to accept from Mr. Lopez as to the subsequent period, as to the Border Patrol agents, which these no less than six of these seven questions focused upon. Indeed, this was a case where I think the evidence was stronger than that presented in Velarde Gomez, in Foster, in Baker, where Mr. Lopez comes to the border and then doesn't leave and then asks to be arrested, and all of this was corroborated by government agents in their own testimony. He left his asthma medicine, his toothbrush, his clothes at home, and he contradicted anything that would indeed contradict his account of events. The government's case was two and a half hours, and he stipulated to certain elements. So, indeed, he presented strong evidence of his defense that the government infringed upon with the Fifth Amendment violations. And I'd like to reserve my 36 seconds for rebuttal. I hear from the government. Good morning, Your Honors. May it please the Court, Timothy Soleil on behalf of the United States. Were you the trial lawyer? I was, Your Honor. So the district court granted the motion in limine directing you not to comment at all on the post-arrest silence of Mr. Lopez, and you did it throughout the trial seven times and emphasized it in your closing argument. That alone strikes me as a competent lawyer's decision to flaunt the judge's order because he knows it will help his case. Your Honor, there was no intentional violation of the court's pretrial order. How could there not be? As the lawyer, the lawyer was well aware at the outset of the trial what you could ask questions about, what you could use in argument, what you could use in rebuttal, and yet you used it on, and it could only have been purposefully because I'm sure as a well-trained lawyer you would know how to limit the argument to comply with the judge's order. So for me, you know, evaluating why would someone do this, it seems it would be to get some tactical advantage, which kind of makes me think that there was something harmful about this, and you knew what it was. Your Honor, there was no intentional violation. I obviously should have clarified, and I tried to limit, given the duress defense, especially in my closing argument, I tried to focus on the immediacy and defendant's failure to tell anyone when he came across the border any of the initial agents is what I tried to focus on initially in the closing arguments. So as to indicate that when encountered six hours after he came through, that defendant never said anything about the threats when he encountered the security officer. He didn't say anything about the threats to the arresting agents, and didn't say anything regarding the threats during the pre-Miranda processing. You did reference post-Miranda. I mean, individuals who were involved in the post-Miranda process too, didn't you? I did, and it's an unusual context in that the Border Patrol Station, there's significant pre-Miranda processing, so certainly the health, the questions regarding the health, the questions regarding the administrative rights form that dealt with the issue of danger and whether or not the defendant feared returning to Mexico, that was pre-Miranda context. Defendant himself on page 161, 162 of the excerpts, defense counsel elicited, did you tell the officers you came in contact, you were running from someone in Mexico? No. So defense counsel clarified that he didn't, with all the officers he encountered, that he never explained anything. What about when you ask about Agent Harrington? That was post-Miranda, wasn't it? Agent Harrington was post-Miranda. So what would be your purpose in asking about comments to Agent Harrington if you knew that was post-Miranda? Well, excuse me, Your Honor, let me clarify. Agent Harrington primarily was during the pre-Miranda processing where the forms regarding whether or not he feared returning to Mexico was filled out, and that defendant claimed that he tried to indicate that he feared returning to Mexico but then checked another box. That was elicited. There were two forms of that nature that were processed. Also health questionnaires and other pre-Miranda processing was conducted. The post-Miranda was very limited. It did not intentionally, did not directly bring up that he invoked his right to silence in this case, unlike the Wong v. Valerio case, which was directly brought up by the prosecutor. But you knew he had invoked his right to silence, and you were under an order not to raise it, and you kept speaking very broadly throughout. He didn't tell anybody. He didn't tell the border patrol. He didn't tell the border agents. And Agent Harrington, who gave him his Miranda rights, and was one of those people that was included in the massive number of people that you kept repeatedly saying that Lopez had not told anybody about the reasons. Yes, Your Honor. Maybe, you know, we don't really know why he, you know, it really, to me this is a credibility issue. I don't really know if he was telling the truth. I don't really know if it wasn't a drug gang pursuing him. Maybe the Mexican police were pursuing him, and I don't know how that would impact the defense of duress. But what I do know is his only defense in this case hung on his credibility. And in cases where credibility is the sole issue, and he gets up there and testifies, and the government overreaches to further undermine the credibility, it just seems to me that you can't meet your burden of proof that it was harmless beyond a reasonable doubt, which is a very hard burden of proof to meet. Well, Your Honor, before I ask any questions to defendant regarding not telling, and obviously Your Honor is correct in not telling, and I went through chronologically, but before I got into those questions, defense counsel had elicited that he had not told any of the officers he encountered regarding that he was being chased from Mexico. Did you make an open-door argument in your brief? Excuse me? Did you make an open-door argument in your brief? I did, Your Honor. And it was, in directing questions to Agent Harrington, I stopped, or intended to stop clear of. But you didn't stop short of Harrington. Well, in asking the questions of Harrington, I did not get into the areas that defense counsel elicited regarding that he was very compliant during the interview and talking about the nature of the interview, also getting into the discrepancy on the box and any kind of miscommunication on the administrative rights form that defendant checked two boxes that defense counsel stated that he had checked the box to state that he feared returning to Mexico, when in fact the boxes were checked otherwise. Counsel, your mistake was in when you said, have you ever told anyone? Because now you recognize that that could be interpreted as encompassing pre-Miranda and post-Miranda. Yes, Your Honor. And defense counsel as well clarified that defendant did not tell anyone, any officer he encountered, that he had been chased from Mexico. What's your response to your burden if we find that there was error? What's your response to your burden to prove that any error was harmless beyond a reasonable doubt? Your Honor, my response is the extent of the comments, when the unanswered comments or the comments that are stricken or the answers that are not answered, that the qualitative extent of the comments was not great. In reviewing the entire closing argument, the emphasis was on the immediacy element and his failure to tell anyone when it initially encountered. So no direct inference of guilt, no invocation was raised, no direct inference of guilt was stressed based on any post-Miranda silence. Defendant himself clarified that he made no statements to any of the officers about being chased. He said because he was scared. So that was, the door was opened by defense. The compliance and the degree of cooperation during the interview was certainly addressed by defense. And the government tried, I tried to focus on the immediacy element. The officers he initially encountered, as well as there not being a well-founded fear because the initial officers he encountered did not, he did not relay any threat or risk of serious bodily injury. Did the jury send any notes or anything reflecting any confusion regarding this issue? No, no, there were no notes. Well, they didn't really spend much time on it, did they, two and a half hours in deliberation? No. Over the lunch hour? Yeah. No. But given, one final note on the, the evidence was strong here in that defendant, it was over six hours later after he had crossed the border that he first asked to be arrested as nightfall was coming. So there was no, as far as the immediacy element, it wasn't even close. We're talking about six hours later. He told no one, and he admitted he told no officer regarding anything about being chased by anyone from Mexico. He passed through the primary officer, who he didn't tell, and several officers within the port of entry telling them nothing about wanting to be arrested or thank goodness I made it safe to America because I was being chased. It was six hours later when he came back to the security guard when he said, I did not want to spend another night on the street. That were the facts of this case. He had an opportunity to immediately turn himself in when he crossed the border. If it was true that he didn't want to spend another night on the street and he wasn't being chased by somebody, why would he have just gone home? It's five to seven minutes to his house. He apparently maybe wanted, I can't speculate as far as what his intentions were, but maybe he wanted to be fed in custody and to have a place to stay in the United States. I can't speculate for all the reasons. There really isn't another logical reason given where his house was located. He had some fear of going back there for some reason. Again, I don't know if it's precise fear that he's saying. I can't speculate as to why. Perhaps he wanted to be fed or have some health care in custody. In any event, he did not tell any of the officers that by his own admission that he had been chased, that he was running from someone in Mexico. Tried to stress the immediacy element and there being no immediate threat of death or serious bodily injury and other alternatives to escape from the threat in immediately turning himself in, in this case. Certainly, what I attempted to stress was not the post-Miranda silence. Did not raise the implication in this matter. I'm looking at your brief. One of the questions you asked was the first time you told any government agent that you feared for your safety because there was a man with a knife was yesterday. And that's, I guess, the day before trial. So that seems a pretty fair focus on the post-arrest silence because that's a pretty long period. How much time was there from the giving of the Miranda warnings to the opening day of trial? I'm not sure exactly. Weeks? Excuse me. The question was what? Was it weeks? From what's the... From the post-arrest silence, well, from the giving of the Miranda rights and Lopez's exercise of his right to remain silent to the first day of trial. It was probably a period of weeks. And you started out with emphasizing he didn't tell anyone until yesterday. Yes, Your Honor. Defense also clarified that he did not tell anyone as well. No, I just don't understand why the government, when it has probably a very strong case and argument, overreaches in this kind of thing, creating this grounds for appeal. I mean, I just see it repeatedly. I mean, there was no need for you to go there. Your Honor, some of the questions were regrettable, obviously, but in its totality in reviewing the entire context of the questions, as well as the emphasis stressed in closing argument, the government does believe that any error was harmless. Well, however we roll on this case, I hope you won't do it again. Yes, Your Honor. The government submits. Do you have some time remaining for rebuttal? Thank you. I'll try to be very brief. First of all, the government's position that the defense opened the door, that wasn't the position taken in their brief with respect to a question of defense counsel. Their position is defense opened the door by asking about the form, the Form 826, which is a form. Defense never said, did you tell anybody anything? And they also claim that the defense opened the door because they brought up evidence that Mr. Lopez was compliant. And the compliance went to the calm demeanor that the government actually elicited in the first place on direct examination. I don't know where in the record the government's talking about that our trial counsel asked, did you ever tell any agent anything? I'm not – don't believe that that statement occurred. I was trying to flip through quickly now. I didn't hear a record cite, but that was not the position taken in their brief, and I don't think it's supported by the record. But what is supported by the record is their position during closing argument, which was that the entire defense duress theory was gutted because Mr. Lopez said nothing to anyone at any time. And that's an excerpt from record page 302 through 303. This is a case not about duress, not about a man running for his life. This man wasn't even running when he was apprehended. He was hanging out near the port of entry, which actually supports his duress claim. But he did not tell any of the agents, any of the immigration officers, any of the customs officials, anybody that he'd been threatened whatsoever. And then he goes on to say there was no duress that was related to any government agent. Counsel, in your view, how should the question have been phrased? The question should have been phrased as the government knew how to do it and did it. You never told the security officer when you first saw him, did you? And Mr. Lopez responded, well, no, but I said I want to be arrested. Arrest me. And then he asked, you never told Agent Buck or Agent Hendricks, did you? And he said, I told them I wanted to be arrested. The reason that the government went on and asked it in the way that they did, because they knew there was no answer to that. He invoked his Miranda rights. He indeed was silent as he was told he could be. He didn't say to Agent Harrington, oh, arrest me. He was already arrested and he'd been read his rights. They weren't getting the answers they wanted out of those first agents. Mr. Lopez was explaining himself. That's why there was the overreaching. Mr. Lopez's conviction should be reversed. Thank you. Thank you, Counsel.
judges: Graber, Wardlaw, Rawlinson